PER CURIAM.

WILLIAM PUGH, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed November 13, 1973.*

LEON R. COOKE, Attorney for Claimant.

WILLIAM J. SCOTT, Attorney General; BRUCE FINNE, Assistant Attorney General, for Respondent.

BURKS, J.

This action was brought to recover damages for personal injuries suffered by the claimant while he was an inmate in Stateville Penitentiary at Joliet. Claimant's injuries were allegedly caused by the negligent acts of a prison guard who forced claimant, under threat of punishment, to ride in an unsafe place on a tractor in violation of prison rules.

We will first state certain facts which are not in dispute. On April 22, 1967, claimant was a prisoner at Stateville Penitentiary, confined on the prison farm. On that date he was assigned by the officer in charge to work on the plumbing detail, digging ditches and pushing a wheelbarrow. The 7 men in this detail were taken by truck to the place where the work was to be done, in the vicinity of the dairy barn. At the end of the day's work, the claimant and approximately six other prisoners, in violation of penitentiary rules, rode on a tractor from the work area back to the dormitory. One prisoner stood on each side of the driver. Three or possibly four prisoners, including the claimant, sat on a pipe running the width of the front of the tractor with their feet dangling into a large scoop which was held to the tractor by the pipe. As the tractor, traveling approximately twenty miles per hour, approached the dormitory, it struck a hole in the road. Although claimant was trying to brace himself by holding onto the pipe with both hands, he was thrown onto the tire of the tractor and from there to the road. He broke both bones in his right arm, leaving some permanent loss of use.

Claimant's testimony at the hearing may be summarized in its pertinent part as follows: On the date of his injury, there was no truck to take the prisoners back to their dormitory when their day's work was finished. Therefore, an officer in charge ordered the men to ride on the tractor as stated above. Claimant thought that the officer's name was Byrd. Claimant protested to this officer that it would be dangerous to ride on the scoop of the tractor and particularly on the end where claimant was directed to sit. His remonstrations were ignored, and the officer threatened to call the Lieutenant if claimant did not obey. Claimant understood that the penalty for disobeying such an order would automatically be 7 days in

isolation. Hence, he rode on the scoop in a dangerous position as directed.

The only evidence presented by the respondent, by way of rebuttal, was the testimony of one Howard Burge. Burge was formerly employed, but since retired, as an officer at Stateville where he had been in charge of the dairy for some 16 years, and was so employed at the time of claimant's injury. Officer Burge testified that he had never been in charge of a ditch digging detail; did not know the claimant but was sure that the claimant had never been under his supervision.

The court is somewhat mystified that respondent would rely solely on the testimony of a witness who said he knew nothing about claimant's accident or any of the facts relating to it. Officer Burge said that he, personally, had never ordered an inmate to ride on a tractor; confirmed the fact that there is a prison rule against anyone riding on a tractor other than the driver; and that he did not know what officer was in charge of the ditch digging detail at the time of claimant's injury.

If so, the court is at a loss to understand why the officer who was in charge of the ditch digging detail was not called as a witness. Respondent's records would surely contain this information on a case in which a prisoner is seriously injured and taken to the prison hospital. It also seems odd to us that the prison's records of this accident were not offered in evidence by the respondent.

Respondent bases it defense on the fact that claimant was confused as to the name and the physical appearance of the officer who ordered him onto the tractor. Contending that there was no officer at Stateville by the name of "Byrd", and that neither Officer Burge nor any other officer is as large a man as claimant had previously

described "Byrd" to be, respondent concludes that no officer gave the order; that claimant must have voluntarily elected to ride as he did on the tractor; and that claimant was, therefore, contributorily negligent.

We do not believe that such conclusion is logically or legally justified. The fact that claimant admittedly had difficulty in spelling and pronouncing names does not necessarily impeach his credibility. We note, at one point in the record, he referred to Captain Cotter as Captain Kanter. It is reasonably understandable that he thought Officer Burge's name was "Byrd" and that, as he explained, this officer looked smaller to him at the hearing than he did when claimant last saw him in his uniform.

We must either accept the testimony of Officer Burge as being factual or as possibly being based on his faulty memory of an incident that had occurred some 3 years prior to his testimony.

If we accept Burge's statements at face value, then there is no evidence in the record to refute claimant's testimony as to the cause of his injury. Burge, being respondent's only witness, said that he knew nothing about claimant's accident or any of the facts relating to it.

This leaves circumstantial evidence as the only possible basis for a finding that claimant was guilty of contributory negligence. We can conceive of only three possible theories on which such a finding might be based, all sheer conjecture, and, in our opinion, all untenable:

1. Claimant could have waited for truck transportation back to the dormitory, but elected to ride on the tractor; or

2. Claimant could have walked back to the dormitory rather than risk the dangers of riding the tractor; or

3. Claimant and his crew arranged their own transportation back to the dormitory by riding the tractor without permission and in violation of prison rules.

There is not a shred of testimony that a truck was sent or would be sent to the dairy barn to take the detail back to the dormitory. The only testimony is that there was no truck. Therefore, claimant did not elect to ride on the tractor when he could have ridden on a truck.

As for walking back to the dormitory, the court takes judicial notice of the fact that individual prisoners cannot roam about prison grounds at will. Unless there was an officer or inmate designated to march the men back to the dormitory, there was no way for claimant to go from the barn to the dormitory by walking. There was no testimony that the men were to be marched to the dormitory.

The record shows that the prisoners, as well as the guards, knew that prison rules forbid anyone other than the driver to ride on a tractor. They also knew the punishment for violating rules. Several of the men, who rode with the claimant on the tractor, were coming up for parole and were keenly aware of the consequence of disobeying an order. The suggestion that claimant and his crew deliberately violated the rule against riding on a tractor, without permission or order, is incredible. In any event, we cannot substitute such conjecture for unrefuted testimony in the record.

Following is the only logical conclusion we can draw from the evidence in this case. A prison guard, whether it was Officer Burge, who said he was in the nearby dairy barn, or some other officer, apparently seeing that no other transportation was available, told the prisoners to get on the tractor and go back to the dormitory. In so doing, the officer violated a rule of the institution that was established for the protection and safety of the inmates. This act of respondent's officer was the direct and proximate cause of claimant's injuries. Claimant,

having no choice but to obey respondent's order, was free from contributory negligence.

We need not cite the numerous cases in which this court has held the State liable for injuries to a prisoner under similar circumstances. Many such cases are referred to in *I.L.P. Vol. 39 §4, "Liability for Injuries to Prisoners"* which summarizes the rules of law applicable to this claim.

We turn now to the question of damages. Claimant prays for an award in the sum of $25,000 for his injuries, his resultant disabilities, and his loss of earnings. The only evidence in the record on the question of damages was that submitted by the claimant. This evidence was not challenged nor refuted by the respondent, and the question of damages is not mentioned in respondent's brief.

It is established from the record that claimant suffered a severe fracture of the radius and ulna bones in his right arm. He was taken to the penitentiary hospital where x-rays were taken, a cast placed on his arm, and where he remained hospitalized for 3 weeks. He was then discharged from the penitentiary and entered Illinois Research Hospital. There surgery was performed on claimant's arm; a plate and a rod were inserted in the arm which was then placed in a cast. Claimant was confined at this hospital for 6 weeks and wore the cast on his arm for 12 weeks. The doctors told him to exercise his arm as there would be some continuing limitation of use.

Dr. Samuel R. Rubert, who subsequently examined the claimant and took further x-rays of his arm, testified as a witness for the claimant, and his x-ray films were made a part of the record at the hearing. Dr. Rubert offices in Chicago and specializes in orthopedics and traumatics.

Dr. Rubert testified as follows: The x-rays showed a fracture through the mid portion of the radius bone and ulna bone of the forearm. There has been an open reduction with a metallic fixation device of both sites of fracture. The fracture in the ulna had been fixed with a pin extending 10 inches in length, and the area of fracture shows either delayed healing or a non-healing process taking place. The area of fracture in the radius is crossed by a plate 3½ to 4 inches long, which is attached with five 1-inch screws. Upon examining claimant's arm during the hearing, Dr. Rubert testified that there is an area of operative scarring of about 6 to 9 inches long on the arm. He found at least ten degrees less flexion in the injured arm, as compared with the other arm. He found a difference of about 10 to 20 degrees in extension of the right wrist, and about 15 degrees difference in flexion of the small finger. The said condition of the claimant is permanent. The pins in the arm have been and will continue to be a source of irritation and pain, and will limit claimant's activities to some extent.

Claimant's former occupation was that of a tailor. Because of his injury and the resultant limitation on the use of his fingers, he has been unable to work as a tailor. He earned modest sums at odd jobs at South Water Market but was unable to find regular work until some 2 years after his injury when he was employed by National Lead as a rood man. This job lasted only 4 weeks, claimant said, because he could not maintain the production pace required. He apparently has subsequently relied on odd jobs. While the court is not convinced that claimant's failure to find gainful employment on a permanent basis is entirely due to his injuries, which were not that severe, we are satisfied that claimant has suffered some unavoidable loss of earnings as a result of his injuries. His out of pocket expenses for medical care were apparently

less than $200 since most of his hospital and medical care were provided without cost to claimant.

This court has frequently stated that there is no fixed rule of compensation in damages for personal injuries, and that compensation is incapable of exact mathematical calculation. Hence, we follow the general rule stated in *I.L.P. Damages §140.* "The measure of compensatory damages is such sum as will compensate the person injured for the loss sustained, with the least burden on the wrongdoer consistent with the idea of fair compensation."

Our Appellate Court has said that the test of propriety of the amount of damages awarded is not the amount of out of pocket expense, but whether the award is within the limits of fair and reasonable compensation. *Congiardo* v. *Bordenaro,* (1969) 105 Ill.App.2d 374.

In exercising the discretion which the above rules place upon this court, it is our judgment that an award of $12,500 to the claimant in this case would be fair and reasonable in the light of all the circumstance and the evidence adduced.

The claimant, William Pugh, is hereby granted an award, for the damages he has sustained, in the amount of $12,500.